OPINION. Disney, Judge-. The first question propounded to us is simple: Was sale of the Maine made by Fairfield, or by Atlantic after acquisition of this ship by liquidation of Fairfield? In our opinion it was made by Fairfield and the agreed gain was property taxed to that corporation. This conclusion we consider proper under Commissioner v. Court Holding Co., 324 U. S. 331, another effort to shift to stockholders the gain from sale of corporate property. Though recognizing the right of Lhe taxpayer to consider tax consequences, we must and do scrutinize the reality of what happened in the facts presented to us. The petitioner (with the burden of proof) seeks to establish a lack of connection between what took place while Fairfield owned the Maine and the transfer of the ship alter liquidation to ALlanUC, along the line of some cases which have recognized such distinction. Thus, the dissent in Court Holding Co. v. Commissioner, 143 Fed. (2d) 823, recognizes that there may be “complete abandonment by the corporation of its purpose to sell and renewal of negotiations followed by a sale by the stockholders.” In Commissioner v. Falcon, 127 Fed. (2d) 277, holding the corporation not liable for tax on gain from sale made by its stockholders the court held, to use the words of Meurer Steel Barrel Co. v. Commissioner, 144 Fed. (2d) 282, “that the acts in that case were unrelated and not part of an anticipatory plan.” We may not, however, fairly come to the same conclusion here. Passing over the one change in the contract (clause 9 above set forth in the facts), consisting of a condition imposed by the United States Maritime Commission as to nonbelligerent use of the ship, accepted by both parties, for we consider such change immaterial, the sale effected was in substance that which had been arranged while Fairfield held title to the ship. That there is here involved no sale by Atlantic, unrelated to what had been done by Fairfield, but one “part of an anticipatory plan,” is wTell shown by the fact that when, on September 19, 1940, Atlantic voted to authorize sale of tlie Maine, Lewis (who had obtained the offer from the British interests) was authorized to negotiate a contract of sale “to a prospective British purchaser, at a purchase price of $50. per deadweight ton; and * * * to sell the vessel with transfer of flag to British registry.” Plainly, the sale was no new matter when Atlantic entered the picture. Petitioner, on brief,, points out that Pendleton, instructed by Lewis, advised Lambert, on September 18, that the price “would be acceptable when the vessel was transferred to Atlantic * * Though the language goes on to state that Pendleton could not deal with Fair-field, nevertheless it thus appears plain that (except for immaterial details) the offer was satisfactory and would be consummated by sale after a transfer of title. It is noteworthy that previous rejections of offers had been on the ground of price, which price was now satisfactory, showing that a deal had now been agreed upon — except for acquiring the property from some one else — indicating, we think, that Atlantic was made a conduit for Fairfield for that purpose. It is to be noted also that, in the words of petitioner’s reply brief, the “$50.00 a ton offer was accepted by Atlantic,” following the transfer to it, yet no evidence appears that any offer was ever made to Atlantic, or substantially other than as submitted while Fairfield was holder of title. Atlantic was not in the business of selling ships, but was in the business of stevedoring. In fact, it never, prior to acquisition of the Maine, owned any ship. All of the facts convince us that this is a case of conduit utilized by the original owner, Fair-field, to route the property to the purchaser after an arrangement so complete as to be considered by the purchaser as binding. Under such facts, and after the expression of the Supreme Court in the Court Holding Co. case,[3] supra, that lack of execution of contract by the corporation (Fairfield) is unimportant; if the sale was in substance the sale of the corporation (Fairfield), we may not give effect to the contention that no firm offer was accepted by Fairfield. We think it was accepted in substance by Fairfield by its conduit Atlantic, if not earlier. Lewis, the same man who governed the matter in accepting for Atlantic, governed the rejection (in effect only until after the transfer) by Fairfield. Such a rejection amounted, in substance, to acceptance, except that another (the conduit or nominee Atlantic) would carry out the agreement. Pendleton’s testimony that “the offer would be acceptable when the vessel was transferred to the Atlantic Coast Shipping Company,” even though followed by a statement that the speaker could not deal or accept for Fairfield, in our opinion indicates clearly the unreality in the contention advocated by the petitioner. The transaction was merely, as a matter of form, completed by Atlantic. Unreality is further suggested, we think, by the fact that, though Atlantic, under petitioner’s theory, received the ship in liquidation on September 23,1940-, and then sold it, the other property, including about $107,000 in cash, -of Fairfield was not transferred to Atlantic until December 27, 1940, so that the liquidation, and apparently the cancellation of the stock held by Atlantic, was, in fact, not comsum-mated until that time — long after disposition of the ship to the British interests. Since, under the provisions of Fairfield’s resolution to liquidate, “all of its assets” were to be transferred to Atlantic “in exchange for all the outstanding stock of Fairfield Steamship Corporation,” the stock held by Atlantic was apparently not canceled until December 27, 1940, and Atlantic is seen dealing with a ship to which it had not, in fact, acquired a right. In addition to the above cases, see Embry Realty Co. v. Glenn, 116 Fed. (2d) 682; R. G. Trippett, 41 B. T. A. 1254; affd., 118 Fed. (2d) 764; S. A. MacQueen, 26 B. T. A. 1337; affd., 67 Fed. (2d) 857; Liberty Service Corporation, 28 B. T. A. 1067; affd., 77 Fed. (2d) 94; Hellebush v. Commissioner, 65 Fed. (2d) 902; affirming 24 B. T. A. 660. We consider George T. Williams, 3 T. C. 1002, distinguishable upon the facts. The New York Statute, section 20, Stock Corporation Law (providing in substance that a stock corporation may sell assets with the consent of the holders of two-thirds of the shares), has no bearing, either in law or logic, upon the power of Fairfield to make the contract. It had only one stockholder. In re Steinbeng's Estate, 274 N. Y. S. 914. We conclude and hold that the Commissioner did not err in adding the profit upon sale of the Maine to the income of Fairfield. Our decision on the first question renders it unnecessary to consider the second question — namely, whether the stock of Cuban owned by Atlantic became worthless in 1940 — because that question is now moot, due to the fact that Atlantic was dissolved in December 1940 and that, with the elimination of the gain derived from the sale of the Maine from Atlantic’s income for 1940, Atlantic’s only other income for. 1940 ($325) is offset by other uncontested deductions for the same period ($105,066.49). Beviewed by the Court. Decision will Toe entered, in Docket No. llftl (.Fairfield) for the respondent, and decision of no deficiency will be entered in Docket No. UflH {Atlantic). * * * The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. [Citing in a footnote: Gregory v. Helvering, 293 U. S. 465 ; Minnesota Tea Co. v. Helvering, 302 U. S. 609; Griffiths v. Commissioner, 308 U. S. 355 ; Higgins v. Smith, 308 U. S. 473.] To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. It is urged that respondent corporation never executed a written agreement, and that an oral agreement to sell land cannot be enforced in Florida because of the Statute of Frauds, Comp. Gen. Laws of Florida, 1927, vol. 3, Sec. 5779. But the fact that the respondent corporation itself never executed a written contract is unimportant, since the Tax Court found from the facts of the entire transaction that the executed sale was In substance the Bale of the corporation. » * *